## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CARMEN MALDONADO-GONZALEZ,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**PUERTO RICO AQUEDUCT AND SEWER AUTHORITY,** *et al.*,<br>Defendants. | Civil No. 22-cv-1250 (BJM) |

### OPINION AND ORDER

Plaintiffs Carmen Maldonado-Gonzalez ("Maldonado"); the Municipality of Morovis ("the Municipality"); and several individual Puerto Rico Aqueducts and Sewer Authority ("PRASA") subscribers who live and work in Morovis (collectively "the Morovis subscribers") filed an amended complaint against PRASA; its Executive Director, Doriel Pagán Crespo ("Pagán"); its Regional Executive Director, José A. Rivera Ortiz ("Rivera"); and an unnamed insurance company on behalf of themselves and others similarly situated. Docket No. ("Dkt.") 23. The Morovis subscribers allege PRASA, Pagán, Rivera, and the insurance company are liable under 43 U.S.C. § 1983 for violations of their Fourteenth Amendment substantive due process and equal protection rights. *Id.*

Maldonado sued in her individual capacity as a PRASA subscriber and in her official capacity as Mayor of Morovis. *Id.* The Morovis subscribers sued Pagán in her personal and official capacities and Rivera in his official capacity. *Id.* PRASA moved to dismiss plaintiffs' claims against it pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. 30. The Morovis subscribers opposed, Dkt. 36, and PRASA replied. Dkt. 53. Acting in her individual capacity, Pagán also moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. 31. Likewise, the Morovis subscribers opposed, Dkt. 41, and Pagán replied. Dkt. 54. This case is before me on consent of the parties. Dkts. 62, 63.

For the following reasons, PRASA and Pagán's motions to dismiss are **GRANTED.**

## BACKGROUND

The following facts are drawn from the amended complaint, Dkt. 23, and are assumed to be true for the purposes of this motion. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (at the motion to dismiss stage "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible").

Morovis is a municipality consisting of fourteen wards located in Puerto Rico's central region. Dkt. 23 ¶¶ 10–11. Maldonado has served as its mayor since January 2017. *Id.* ¶ 21. All plaintiffs have valid registered accounts with PRASA and have made monthly payments for water service. *Id.* ¶ 14. Some members of Plaintiffs' 1,582-person purported class are elderly, sick, or have children. *Id.* ¶ 32, 51. The Municipality and its residents have lacked reliable water service for several years and the situation further deteriorated after Hurricane María. *Id.* ¶¶ 16–17, 21. Most of the time, there is no water service in Morovis. *Id.* ¶ 31. The Municipality has spent more than one million dollars distributing water to residents, hiring experts to advise it on improving water service, and dealing with other unspecified expenses related to the lack of service. *Id.* ¶ 23.

The Río Grande de Manatí ("the river") is the Municipality's primary drinking water source. *Id.* ¶ 15. PRASA pumps water from its Raw Water Supply Intake Facility ("the Intake Facility") on the river into the Morovis Sur Water Treatment Plant ("the Water Treatment Plant") before distributing the water to customers. *Id.* PRASA has blamed water service interruptions on heavy rainfalls, blocked water intakes, high turbidity of water, broken water lines, mechanical failures, and power outages. *Id.* ¶ 25.

Since 2017, leaders from Morovis have met repeatedly with PRASA officials, including Pagán and Rivera, in a fruitless effort to resolve the inconsistent water service. *Id.* ¶ 26. During some months, Maldonado informed Pagán daily of the Morovis wards that lacked water service.

*Id.* ¶ 27. Though PRASA has occasionally sent water trucks to Morovis, it usually provides its Morovis subscribers with no alternative water source during service interruptions. *Id.* ¶ 29. In August 2017, the Morovis subscribers protested the lack of water service alongside hundreds of others outside PRASA's central offices in San Juan. *Id.* ¶ 33.

In April 2018, the Municipality signed an agreement with the U.S. Army Corps of Engineers in which the latter agreed to outline ways to improve the Intake Facility's performance and capacity. *Id.* ¶ 34. In December 2019, the Army Corps of Engineers issued its final report explaining that reducing sediment at the Intake Facility would improve the water supply. *Id.* ¶ 35. The Municipality submitted this report to PRASA which took no action. *Id.*

Since 2019, Maldonado and the Municipality have received information leading them to believe PRASA officials either intentionally shut down aspects of the water system, or instructed employees to do so, to harm Maldonado's image as Mayor of the Municipality. *Id.* ¶ 36. In July 2019, Maldonado sent letters presumably about reports of intentional shutdowns to PRASA's leadership at that time, Puerto Rico's then-Secretary of Justice, and Puerto Rico's then-Inspector General. *Id.* ¶ 37. However, nothing apparently changed as a result. *Id.*

In October 2021, the Municipality hired Tony La Luz ("La Luz"), a former PRASA employee who supervised operations in Vega Baja, Morovis, and Ciales for more than 20 years. *Id.* ¶ 39. The Municipality hoped La Luz could help it better understand the reasons for water service interruptions. *Id.* On February 5, 2022, Maldonado asked La Luz to visit the Water Treatment Plant and find out why there was no water service that day. *Id.* ¶ 40. A PRASA employee told La Luz the Water Treatment Plant had been out of service since 5:00 a.m. because there was no electricity and the generator at the Intake Facility was not working. *Id.* As water could not be pumped from the Intake Facility to the Water Treatment Plant, it could not be delivered to

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)          4

customers. *Id.* La Luz then went to the Intake Facility to verify the power generator was not working. *Id.* A PRASA employee arrived at the Intake Facility at 3:20 p.m. and turned the generator on. *Id.* ¶ 41. In fewer than five minutes, it was running properly. *Id.* When La Luz asked the employee what had happened, presumably in reference to the generator being switched off, the employee remained silent. *Id.* Though the pumps were supposed to turn on automatically once power was restored, they remained off even after the generator was turned on. *Id.* When La Luz asked the PRASA employee to turn the pumps on, the employee refused and said he had to call a supervisor who in turn would send another employee to turn on the pumps. *Id.* La Luz called the supervisor himself and similarly was told another employee would need to be sent to turn the pumps on. *Id.* When that employee arrived, he or she turned on the pumps without incident. *Id.* At this point, La Luz, and presumably the PRASA employee who turned on the pumps, visited the Morovis intermediate tank and found pumps there were turned off as well. *Id.* ¶ 42. This employee told La Luz those pumps should have automatically come on upon receiving electricity. *Id.* Apparently, they had been switched off. *Id.* Again, the PRASA employee turned them on without incident. *Id.*

La Luz recounted his experience to Maldonado the following day. *Id.* ¶ 43. Maldonado called PRASA Regional Executive Director Rivera to relay La Luz's story. *Id.* Though Rivera expressed disbelief, a PRASA supervisor who was next to Rivera during the call confirmed La Luz's version of events. *Id.* Maldonado asked Rivera to check the surveillance cameras at PRASA's facilities to determine who had turned off equipment and to inform her of the results so she could act accordingly. *Id.* However, as of July 2022, Rivera had not informed Maldonado whether the surveillance cameras captured anyone turning off equipment at the Water Treatment Plant or Intake Facility. *Id.*

The Municipality has apparently proposed various solutions to PRASA. At one point, though it is unclear when, La Luz asked Rivera why PRASA's 200,000-gallon water tank in Morovis was not being used and Rivera stated he did not know the tank existed. *Id.* ¶ 46. Maldonado has repeatedly asked Pagán to connect the Municipality's water system to a PRASA pipeline that can deliver approximately 100 million gallons of water per day. *Id.* ¶ 47. However, Pagán stated all other alternatives should be tried first. *Id.*

## APPLICABLE LEGAL STANDARDS

When faced with a motion under Fed. R. Civ. P. 12(b)(6), the court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor" to determine if the complaint states a claim for which relief can in fact be granted. *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011). The court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the [ ] complaint, matters of public record, and facts susceptible to judicial notice." *Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc.*, 920 F.3d 111, 114 (1st Cir. 2019) (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)) (internal quotations omitted). In undertaking this review, the court must first "'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,]' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.'" *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (alteration in original) (quoting *Zenón v. Guzmán*, 924 F.3d 611, 615–16 (1st Cir. 2019)). "Plausible . . . means something more than merely possible," and gauging the plausibility of a claim for relief is "a 'context-specific' job" that requires drawing on "'judicial experience and

common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## DISCUSSION

### I.    Section 1983

Section 1983 does not create substantive rights, but rather provides a cause of action through which a plaintiff can vindicate federal rights elsewhere conferred. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). Courts determine section 1983 liability by examining "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 558 (1st Cir. 1989) (further citation omitted). Acting under color of state law requires that a "defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The first step in any section 1983 claim is to identify the specific constitutional right allegedly infringed. *Fernandez-Fernandez v. Municipality of Bayamon*, 942 F. Supp. 89, 93 (D.P.R. 1996) (citing *Albright*, 510 U.S. at 269–271) (further citations omitted).

### A.  Rights Allegedly Infringed

PRASA and Pagán note that Plaintiffs alleged a substantive due process violation while citing caselaw addressing procedural due process violations. Dkt. 30 at 6, 8–11; Dkt. 31 at 6–9. In a plurality decision, the Supreme Court did not analyze a procedural due process argument it acknowledged could have been raised because a petitioner only alleged a substantive due process violation. *Albright*, 510 U.S. at 271. Citing this decision, the First Circuit only analyzed a

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)          7

plaintiff's substantive due process claim because, though the plaintiff raised both substantive and procedural due process claims at the district court, it only raised its substantive claim on appeal. *S. Cnty. Sand & Gravel Co. v. Town of S. Kingstown*, 160 F.3d 834, 835 (1st Cir. 1998). However, it briefly noted the plaintiff could not prevail on either claim. *Id.* at 836. This court has analyzed both procedural and substantive claims where a complaint pled solely that "[the] process of summary suspension violated plaintiff's due process rights." *Rodriguez-Deynes v. Moreno-Alonso*, 2019 WL 1354030 at *8 (D.P.R. Mar. 22, 2019). There, the court noted the plaintiff argued he brought a substantive due process claim when opposing a motion to dismiss, but his complaint's focus on procedures "urge[d] the court down a road of procedural rather than substantive due process." *Id.* Likewise, it noted the substantive claim had little chance of success. *Id.* at 9.

Here, the Morovis subscribers consistently urge this court to analyze their claims under the substantive due process framework. They allege PRASA and its agents' behavior "shocks the conscience," a hallmark of substantive due process claims. Dkt. 23 at 11 ¶ 48; *see Licari v. Ferruzzi*, 22 F.3d 344, 347 (1st Cir. 1994) ("A viable substantive due process claim requires proof that the state action was 'in and of itself . . . egregiously unacceptable, outrageous, or conscience-shocking.'"). More explicitly, they request a judgment that "Defendants' failure to provide water service to Plaintiffs' and the class members violate [sic] their substantive due process and equal protection rights established in the Fourteenth Amendment." Dkt. 23 at 17. And if any doubt remained, the Morovis subscribers stated in their opposition to PRASA's motion to dismiss that, "PRASA is correct that Plaintiffs are not asserting a *procedural* due process claim against it. What Plaintiffs are asserting is a *substantive* due process claim." Dkt. 36 at 2 (emphasis in original). Further, in their opposition to Pagán's motion to dismiss, the Morovis subscribers argue Pagán mischaracterized their cited authority by stating it only applied to procedural due process claims.

Dkt. 41 at 2. Thus, at all points of this litigation, the Morovis subscribers have insisted they are raising a substantive, not procedural, due process claim.

Moreover, a procedural due process claim "requires a showing that the plaintiff was deprived of a protected liberty or property interest without adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Roman-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 47 (1st Cir. 2011) (quotations and citations omitted). As in *Roman-Oliveras*, the Morovis subscribers do not address in their complaint either notice or the opportunity to be heard. Accordingly, the *Roman-Oliveras* court affirmed dismissal of the section 1983 claim without analyzing the procedural due process theory. *Id.* Likewise, I will not analyze plaintiffs' allegations under the procedural due process framework.

Thus, I analyze the Morovis subscribers' substantive due process claim and find they failed to plausibly state such a claim. In that discussion, I note their political retaliation allegations should have been brought under the First Amendment. However, "[a] First Amendment violation was not claimed by plaintiff[s], and therefore, this Court is unable to decide this case under First Amendment analysis." *Fernandez-Fernandez*, 942 F. Supp. at 94 (explaining that to do otherwise would make the court plaintiffs' advocate). Next, I find the Morovis subscribers failed to state an equal protection claim. Because I find the Morovis subscribers failed to plausibly allege any claim, I do not reach PRASA's arguments regarding its immunity under its enabling act and PROMESA, Plaintiffs' lack of entitlement to injunctive relief, or Plaintiffs' failure to satisfy the requirements for a class action. Similarly, I do not reach Pagán's qualified immunity argument.

## B. Substantive Due Process

Substantive due process guards against arbitrary and capricious government actions. *Licari*, 22 F.3d at 347. Substantive due process claims are limited to extreme cases and "the

threshold for establishing the requisite 'abuse of government power' is a high one indeed." *Id.* at 350 (quoting *Nestor Colon–Medina & Sucrs., Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992)). "A viable substantive due process claim requires proof that the state action was in and of itself egregiously unacceptable, outrageous, or conscience-shocking." *Id.* at 347 (internal quotation marks and citation omitted); *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 622 (1st Cir. 2000). Courts have described such actions as running counter to "the concept of ordered liberty," and appearing "shocking or violative of universal standards of decency." *Castro Rivera v. Fagundo*, 310 F. Supp. 2d 428, 435 (D.P.R. 2004), *aff'd*, 129 F. App'x 632 (1st Cir. 2005) (quoting *Cruz-Erazo*, 212 F.3d at 622 (quoting *Amsden v. Moran*, 904 F.2d 748, 753–54 (1st Cir.1990))) (further quotation marks omitted). "Substantive due process does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law." *Castro Rivera*, 310 F. Supp. 2d at 436. Instead, it prevents governmental power from being used for oppression, abuse that shocks the conscience, or actions not sufficiently keyed to any legitimate state interests. *Id.* "[B]ecause guideposts for responsible decisionmaking in this unchartered area are scarce and open ended," it should be used sparingly. *Castro Rivera*, 310 F. Supp. 2d at 436 (quoting *PFZ Properties v. Rodriguez*, 928 F.2d 28, 31–32 (1st Cir. 1991) (overruled on other grounds)).

The criteria for identifying government action proscribed by the constitutional guarantee of substantive due process vary depending on whether the challenged action is legislative or executive in nature. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In the case of executive action, the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," nor does it "guarantee due care" by government officials. *Id.* at 848–49. "Where, as here, a plaintiff's substantive due process claim

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)         10

challenges the specific acts of a state officer, the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006). "[B]ecause 'executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims,' the question of whether the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized." *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005) (citing *Lewis*, 523 U.S. at 847 n. 8).

### i.      Shocks the Conscience

When plaintiffs allege state actors engaged in activity that shocks the conscience, "the activities complained of must do more than offend some fastidious squeamishness or private sentimentalism." *Cruz-Erazo*, 212 F.3d at 622 (internal citations and quotation marks omitted). The First Circuit consistently finds governmental conduct to be egregiously unacceptable, outrageous, or conscience-shocking when state action is "highly physically intrusive." *Id.* (internal citations omitted) (discussing the Supreme Court and the First Circuit's findings, respectively, of conscience-shocking state action where a suspect's stomach was forcibly pumped to obtain evidence and where a suspended officer had to undergo a penile plethysmograph to be reinstated). "Verbal or other less physical harassment" generally does not rise to a conscience-shocking level. *Id.* (internal citations omitted) (discussing how no constitutional violation occurred where public school students had to attend a sexually explicit AIDS awareness production and where an inmate slipped on pillow that was a negligently placed by a prison employee).

The Morovis subscribers' allegations that PRASA shut off their water to sabotage Maldonado's political career are deeply troubling. However, they cite no authority stating such

behavior meets the high bar the First Circuit has set for substantive due process claims. Further, relevant authority points in the opposite direction. *See Guertin v. State*, 912 F.3d 907, 924 (6th Cir. 2020) (distinguishing failure to provide water service, which did not violate substantive due process, from city's provision of contaminated water), *cert denied*, *City of Flint, Michigan v. Guertin*, 140 S. Ct. 933 (2020). Moreover, substantive due process is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision. *See S. Cnty. Sand & Gravel Co. v. Town of S. Kingstown*, 160 F.3d 834, 835 (1st Cir. 1998); *Lewis*, 523 U.S. at 843; *Graham v. Connor*, 490 U.S. 386, 395 (1989). Thus, to the extent the Morovis subscribers rely on charges that Pagán's actions were driven by political motives, they have no substantive due process claim at all. The First Amendment, not the Fourteenth Amendment, protects individuals against state-sponsored acts of political discrimination or retaliation. *See Calderon*, 448 F.3d at 33–34 (concluding same where Plaintiffs alleged Puerto Rico government-sponsored financial institution denied its loan request as political retaliation). Accordingly, Plaintiffs may not base their substantive due process claim on allegations of political retaliation because such behavior is covered by the First Amendment.

Aside from sabotage, Plaintiffs' remaining allegations paint a picture of incompetence and a lack of urgency to fix their city's water issues. For example, Plaintiffs allege Rivera did not know about a 200,000-gallon water tank in Morovis and that Pagán wanted to try all other solutions before connecting the Municipality's water system to a PRASA pipeline that can deliver approximately 100 million gallons of water per day. Dkt. 23 ¶¶ 46–47. They contend Pagán's behavior amounts to deliberate indifference which shocks the conscience but cite no authority for this proposition. Dkt. 41 at 6. Though understandably frustrating to Plaintiffs, neither example rises to a conscience-shocking level as articulated by the First Circuit. Negligent conduct is

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)          12

categorically insufficient to shock the conscience. *Depoutot*, 424 F.3d at 119 (citing *Lewis*, 523 U.S. at 849). Such conduct must be "intended to injure in some way unjustifiable by any government interest." *Id.* (quoting *Lewis*, 523 U.S. at 849). "[T]he requisite arbitrariness and caprice" for a conscience-shocking executive action "must be stunning, evidencing more than humdrum legal error." *Amsden*, 904 F.2d at 754 n. 5.

A case arising from the recent drinking water crisis in Flint, Michigan illustrates the point. There, the Sixth Circuit discussed three factors when evaluating whether officials' conduct shocked the conscience: (1) the time for deliberation, (2) the nature of the relationship between the government and the plaintiff, and (3) whether a legitimate government purpose motivated the official's act. *Guertin*, 912 F.3d at 924. "Essentially, the more voluntary the plaintiff-government relationship, or the less time the state actor has to deliberate, or the greater the extent to which the state actor is pursuing a legitimate end, the less arbitrary we should deem a bodily injury or death caused by the state actor." *Id.* at 925 (citation omitted). Like the defendants in *Guertin*, Pagán had opportunities for repeated reflection over the state of water service in Morovis since beginning her tenure at PRASA in 2020. During this time, Plaintiffs allege she has repeatedly engaged with them to explore solutions to the problem, but improvements have failed to materialize. Plaintiffs thus plausibly alleged that Pagán had significant time for deliberation.

However, the second factor of the analysis renders this case entirely distinguishable from *Guertin*. The *Guertin* court found plaintiffs there and the City of Flint had an involuntary relationship because the city charter required it to provide residents with water and required residents to take and pay for water unless they had an approved well. *Id.* at 925. Here, Morovis subscribers do not allege either that PRASA was required by law to provide them with water or that they were required to take and pay for it. Further, because Flint officials knowingly provided

contaminated water while assuring residents the water was safe, they turned residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination. *Id.* at 925–26. The *Guertin* court found a substantive due process violation because this amounted to a forced, involuntary invasion of bodily integrity. *Id.* Here, no such invasion occurred because PRASA, instead of supplying contaminated water, allegedly has failed to provide any water at all. And, as mentioned, the *Guertin* court specifically distinguished the failure to provide water from the provision of contaminated water stating that the former did not invade bodily integrity and thus did not violate substantive due process. *Id.* at 924.

Lastly, the *Guertin* court found no conceivable government objective that justified supplying Flint residents with lead-contaminated water. *Id.* Here, the Morovis subscribers allege PRASA's historically deficient service has worsened on Pagán's watch. They further claim Pagán has ignored the U.S. Army Corps of Engineers' recommendation to clear sediment from one of its facilities serving Morovis. They assert Pagán's failures are motivated by their political loyalties, an inappropriate basis for a substantive due process claim, and a lack of urgency to address their plight. Crediting the latter contention, they nevertheless fail to allege Pagán's conduct shocks the conscience as defined by the substantive due process inquiry because they failed to identify action that was highly physically intrusive and "intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. Under First Circuit caselaw, the inquiry ends there. *See Depoutot*, 424 F.3d at 118.

### *ii.      Constitutional Violation*

Though the Morovis subscribers failed to demonstrate PRASA's inconsistent service shocked the conscience, I note they cited several cases and PRASA's enabling statue to assert that it amounted to a constitutional violation. I address that authority here to clarify that, even though

Plaintiffs cited caselaw establishing a property interest in the continued receipt of utility services under the procedural due process analysis, that does not necessarily translate to a property interest in the uninterrupted receipt of water service at all times. Even if such a right exists, Plaintiffs' cited authority echoes the analysis above illustrating that the interruption of water service does not shock the conscience as is required to state a substantive due process claim.

The Fourteenth Amendment prohibits states from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Property interests are not created by the Constitution, but rather "stem from an independent source such as state law." *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 6 (1st Cir. 2000) (citation omitted). The Supreme Court has previously assumed that an individual has "a substantive right under the Due Process clause [to be] . . . free from arbitrary state action" depriving him of property. *Newman v. Burgin*, 930 F.2d 955, 962 (1st Cir. 1991) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985)) (further citation omitted). However, it has not explicitly held that such a right exists, nor has it described its contours. *Id.* Accordingly, the First Circuit has assumed without deciding that property may not be deprived through arbitrary state action. *See id.*

The Morovis subscribers allege PRASA and Pagán violated their substantive due process right to continuous water service, which they contend is a property interest. Dkt. 23 at 15–17. "There is, of course, 'no fundamental right to water service.'" *Guertin*, 912 F.3d at 921 (quoting *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016)). That is because such a right "is not rooted in our nation's traditions or implicit in the concept of ordered liberty." *In re City of Detroit*, 841 F.3d 700. Thus, the Morovis subscribers' claim can only survive if Puerto Rico law or their contracts with PRASA gave rise to a constitutionally protected property interest.

They assert this court has previously recognized that both Puerto Rico law and PRASA contracts create such a property interest. Because the Morovis subscribers focus on *Memphis Light Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) and *Marrero García v. Irizarry*, 829 F. Supp. 523 (D.P.R. 1993), *aff'd*, 33 F.3d 117 (1st Cir. 1994), I begin my analysis there. The Morovis subscribers contend these cases established their constitutional right to continuous water service. They are incorrect because both cases address the procedural due process to which utility subscribers are entitled before their accounts are terminated or suspended for nonpayment.

*Memphis Light* applied the *Mathews* framework, which examines: (1) the private interest that will be affected by official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) "the Government's interest, including the function involved and the fiscal and the administrative burdens that the additional or substitute procedural requirement would entail." *Memphis Light*, 436 U.S. at 17–18 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)). Under that analysis, the *Memphis Light* court "held that where state law provided that utility service could be discontinued only for cause, customers of the utility who brought suit after the termination of such services 'assert[ed] a legitimate claim of entitlement within the protection of the Due Process Clause.'" *Marrero Garcia*, 829 F. Supp. at 527 (quoting *Memphis Light*, 436 U.S. at 11–12) (further quotation marks omitted).

*Marrero Garcia* applied *Memphis light* to Puerto Rico utility customers. The *Marrero Garcia* court observed, "[a]s a general matter, an interest becomes a protected property interest when recognized by state statute or a legal contract between the state agency and the individual." *Marrero Garcia*, 829 F. Supp. at 527 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Puerto Rico law recognizes a property interest in the receipt of utility services which is at least

equal to the interest established under the Tennessee law which was at issue in *Memphis Light*." *Id.* Finding that Puerto Rico law guarantees public utility subscribers notice and the opportunity to be heard before termination of services, the *Marrero Garcia* court held Puerto Rico law was clear that "a subscriber to public utility services has a protectable property interest in the continued receipt of services." *Id.* at 527–28.

Here however, the Morovis subscribers do not allege their water service was terminated without notice or an opportunity for a hearing. As discussed, they specifically reject Defendants' efforts to apply that framework to their claims. Dkt. 36 at 2; Dkt. 41 at 2. Instead, they allege their water service is inadequate and unreliable. Dkt. 23 at 16 ¶ 68; Dkt. 36 at 4. *Memphis Light* and *Marrero Garcia* do not address such a situation. Plaintiffs appear to conflate the procedural due process right to a notice and hearing before termination of services with the right to be free from water service interruptions at all times. However, though the provision of water service may create a property interest bringing that service within the Fourteenth Amendment's procedural protections, measured according to *Matthews v. Eldridge,* it "does not transform the expectation into a substantive guarantee against the state in any circumstance." *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1476 (6th Cir. 1993) (quoting *Ransom v. Marrazzo*, 848 F.2d 398, 411–12 (3d Cir. 1988)). In other words, water service "is not a . . . federally protected right." *Id.* (quoting *Ransom*, 848 F.2d at 411–12). Thus, while *Memphis Light* and *Marrero Garcia* guarantee public utility subscribers notice and the opportunity to be heard before termination of services, neither holding protects utility customers from irregular or insufficient water service. Accordingly, neither case supports the Morovis subscribers' claim.

The Morovis subscribers note that courts have found Puerto Rico utility customers have a property interest in the continued receipt of services in the electricity context. Dkt. 36 at 8 (citing

*Santiago Ramos v. PREPA*, 834 F.3d 103, 106 (1st Cir. 2016) and *Albizu-Merced v. PREPA*, 2013 WL 101618 at *3 (D.P.R., Jan. 8, 2013)). That may be so, but such holdings do not support Plaintiffs' substantive due process claim. Again, both cases address procedural due process and specifically distinguish the right to notice and a hearing before termination of services from the right to receive utility service in and of itself. *Santiago Ramos* held "Plaintiffs–Appellants did not establish that they have a property interest in electricity itself," but at most in continued receipt of services that could only be terminated for cause. 834 F.3d at 106. The *Albizu-Merced* court began its analysis noting that plaintiffs there "use[d] language that seems to hint at a substantive due process claim" because they alleged termination of their electric service shocked the conscience. 2013 WL 101618 at *2. However, the court quickly disposed of this possibility finding, "[n]eedless to say, terminating Plaintiffs' electrical service falls far short of the 'brutal' and 'demeaning' conduct necessary to configure a substantive due process claim." *Id.* (citing *Maymi v. Puerto Rico Ports Authority*, 515 F.3d 20, 30 (1st Cir.2008)). Though the Morovis subscribers cite *Albizu-Merced* as evidence they have a property interest in water service sufficient to state a substantive due process claim, that case illustrates the fundamental flaw in Plaintiffs' argument. The *Albizu-Merced* court found that, while plaintiffs there had plausibly stated a property interest in electric service sufficient for a *procedural* due process claim, they failed to state a substantive due process claim. *Id.* Thus, even if the Morovis subscribers have a property interest in receiving uninterrupted water service, which it is not clear they do, PRASA's failure to provide uninterrupted water service would not suffice to state a substantive due process violation.

In their opposition to PRASA's motion to dismiss, the Morovis subscribers argue their lack of water suffices to assert constitutional violations by citing extensively to *Hardeman v. County of Lake*, 2018 WL 3533254 (N.D. Ill., July 23, 2018), *aff'd sub nom. Hardeman v. Curran*, 933 F.3d

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)        18

816 (7th Cir. 2019). *See* Dkt. 36 at 10–11. In *Hardeman*, five pre-trial detainees sued arguing a county jail's three-day water shutoff violated their Eighth and Fourteenth Amendment rights. *See* 2018 WL 3533254 at *2. On a motion to dismiss, the court held the water shutoff itself likely did not amount to a constitutional violation because it was connected with a legitimate government purpose and the detainees were provided with alternative water sources. *Id.* at 3. Nevertheless, it found the detainees stated a plausible due process claim based on the associated hygiene issues (clogged toilets which attracted rats and created a stench that made detainees sick, agitated and sleep-deprived). *Id.*

Again, *Hardeman* is a procedural, not substantive, due process case. The *Hardeman* court observed that "the proper framework for evaluating constitutional challenges to the conditions of pretrial detention is to examine whether those conditions amount to punishment since punishment prior to a determination of guilt violates due process under the Fourteenth Amendment." *Hardeman* 2018 WL 3533254, at *2 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). The *Bell* court, which also examined confinement conditions, explained that punitive measures may not be imposed prior to a determination of guilt. 441 U.S. at 537. It distinguished between detainees' right to be free from punishment prior to a determination of guilt and their right to be free from discomfort while detained, finding the latter "simply does not rise to the level of those fundamental liberty interests delineated in" substantive due process cases. *Bell*, 441 U.S. at 534–35 (citing *Roe v. Wade*, 410 U.S. 113 (1973); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Meyer v. Nebraska*, 262 U.S. 390 (1923)). In other words, the detainees in *Hardeman* had no substantive due process right to running water; they had a procedural due process right to be free from punishment prior to an adjudication of guilt and subjecting them to clogged toilets plausibly constituted such a punishment.

The Morovis subscribers also cite various sections of PRASA's enabling act that they assert give rise to a property interest. Dkt. 36 at 7–8. First, they argue section 142 deems PRASA's services "an essential government function." *Id.* at 7 (citing 22 L.P.R.A. § 142). Next, they argue section 144 states PRASA "is created for the purpose of providing and helping to provide for the citizens an adequate drinking water, sanitary sewage service and any other service or facility proper or incidental thereto." *Id.* (citing 22 L.P.R.A. §144). Lastly, they argue that "water available shall be utilized in the fullest measure possible and that it shall be made available to consumers with the greatest possible regularity and continuity." *Id.* at 8 (citing 22 L.P.R.A. §159). PRASA responds that section 144 of its enabling act undermines Plaintiffs' property interest because it grants PRASA immunity from suit based on the impurity, irregularity, and insufficiency of water. Dkt. 53 at 7. PRASA also argues its regulations undermine Plaintiffs' property interest in receiving water. *Id.* at 7–8. Neither party cites authority addressing whether PRASA's enabling act or its regulations give rise to a property interest for the purpose of substantive due process and I decline to make that determination here. As discussed, even if PRASA's enabling act may have created a property interest in uninterrupted water service, that fact would be inconsequential in this action because the Morovis subscribers failed to plausibly allege that water service interruptions shocked the conscience as required to state a substantive due process claim.

Finally, the Morovis subscribers also allege their substantive due process right arises from their relationship as PRASA subscribers. Dkt. 23 ¶ 68; Dkt. 36 at 8. However, courts regularly hold that "a simple breach of contract does not amount to an unconstitutional deprivation of property." *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) (collecting cases). "To hold otherwise would run the risk of transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case."

*Maldonado-Gonzalez, et al. v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No. 22-1250 (BJM)          20

*Redondo-Borges*, 421 F.3d at 10. Applying this principle in the utility context, the Sixth Circuit held the customer relationship between a utility and its subscribers is an insufficient basis to find a substantive due process violation. *In re City of Detroit,* 841 F.3d at 700. The Morovis subscribers' contracts with PRASA therefore fail to plausibly state a substantive due process violation.

At this stage, the Morovis subscribers have, at best, asserted a constitutionally protected interest in uninterrupted water service based on caselaw from the Puerto Rico electricity context and PRASA's enabling act. However, they failed to plausibly allege the depravation of this purported right shocks the conscience. Thus, they failed to state a substantive due process claim.

### C. Equal Protection

The Morovis subscribers allege in their complaint that they were deprived of their substantive due process and equal protection rights established in the Fourteenth Amendment of the United States Constitution. Dkt. 23 at 17. They originally brought an equal protection challenge to the section of PRASA's enabling act that immunizes it from suits for damages arising from impurity, irregularity, or insufficiency of water it supplies. Dkt. 1 ¶ 68; *see* 22 L.P.R.A. § 144(c). However, this was removed from their amended complaint. Dkt. 23. An amended complaint completely supersedes the original complaint, and the original complaint no longer performs any function in the case. *Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003). Thus, by omitting the equal protection challenge to PRASA's enabling act, the Morovis subscribers abandoned it. *See id.* Though language alleging an equal protection violation still appears in their amended complaint, the Morovis subscribers do not explain the purported basis for this violation. The "mere allusion" to the infringement of a constitutional right is insufficient to put the matter at issue in a section 1983 action. *Tower v. Leslie-Brown*, 326 F.3d 290, 299 (1st Cir. 2003). Thus, the Morovis subscribers have not properly alleged an equal protection violation.

Even if the Morovis subscribers alleged such a violation, they subsequently waived it with respect to Pagán. She notes that the Morovis subscribers omitted their equal protection challenge to PRASA's enabling act in her motion to dismiss. Dkt. 31 at 12. That motion "request[s] that Plaintiffs' claims against Pagán-Crespo, in her personal capacity, be dismissed with prejudice." Dkt. 31 at 16. Neither party addresses the equal protection analysis in their briefs. After Pagán asserted that the Morovis subscribers dropped their equal protection allegations in their amended complaint, Plaintiffs did not mention their equal protection argument in their opposition. By failing to respond to Pagán's contention, the Morovis subscribers waived this aspect of their claim. *See Short v. Brown Univ.*, 320 F. Supp. 3d 363, 369 (D.R.I. 2018) (finding failure to offer one word in response to arguments raised in a Rule 12(b)(6) motion to dismiss constituted a waiver of that aspect of the claim). Thus, to the extent the amended complaint alleges an equal protection claim against Pagán at all, the Morovis subscribers waived that claim by failing to address Pagán's assertion they abandoned it.

Moreover, the Morovis subscribers have not alleged facts giving rise to an equal protection claim. To establish an equal protection violation, plaintiffs must show that: (1) "compared with others similarly situated, [they were] selectively treated" and (2) that such treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir.2001) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 909–10 (1st Cir.1995)). The mentioned statute immunizing PRASA from suit for alleged impurity, irregularity, or insufficiency of water does not treat Morovis subscribers differently from others similarly situated because it immunizes PRASA from all suits for this purpose. Further, though the Morovis subscribers allege PRASA officials shut off

their water for political reasons, their complaint offers no comparison to similarly situated subscribers who received continuous water service. *See Pagan*, 448 F.3d at 35 (finding failure to cite similarly situated comparator warranted dismissal under Rule 12(b)(6)); *see also Norton v. Autoridad de Acueductos y Alcantarillados* 2011 WL 4625995 at *6 (D.P.R. Oct. 3, 2011) (finding "class-of-one" equal protection plaintiff met motion-to-dismiss burden for showing PRASA treated him arbitrarily by citing adjacent neighbors who received water). Thus, even if the Morovis subscribers still alleged an equal protection violation, they failed to plead facts sufficient to state a claim. Therefore, PRASA and Pagán are entitled to dismissal of the Morovis subscribers' equal protection claim.

Accordingly, PRASA and Pagán's motions to dismiss Plaintiffs' Section 1983 claims are **GRANTED**.

## CONCLUSION

For the foregoing reasons, PRASA's motion to dismiss plaintiffs claims against it and Pagán's motions to dismiss Plaintiffs' claims against her in her personal capacity are **GRANTED**.

Plaintiffs' section 1983 claims against PRASA and Pagán in her personal capacity are **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of March, 2023.

**S/ Bruce J. McGiverin**
BRUCE J. McGIVERIN
United States Magistrate Judge